UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

AMERRISQUE TABLADA

      VS                            1:25-CV-00284

ROCKET MORTGAGE
SEVEN DEUCE, LLC
GINNIE MAE II

REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION TEMPORARY

This matter is before the Court on Plaintiff's Motion for a Preliminary

Injunction against Rocket Mortgage and Seven Deuce, LLC to preclude the

transfer of a Foreclosure Deed. This motion should be granted for several reasons.

The Plaintiff has hired James Roch, a certified appraiser of Roch Appraisla

to obtain an appraisal. This appraisal, which will be provided later today, indicates

that the property is work $425,000.00 which is $125,000.00 more than the amount

that the bid of the second highest bidder. This indicates that the Plaintiff and his

family will be irreparably harmed if this sale is allowed to proceed. This amount

does not cover the amount of the second mortgage on the property payable to

HUD.   Thus the United States government will incur a loss due to this

noncompliant foreclosure with the Plaintiff and his family subject to potential

eviction.

The Defendant did not comply with the HUD Regulations which were binding on the Defendant, Rocket Mortgage. It also did not comply with RESPA section, 12 C.F.R. 1024.39 which mandated that within 36 days of a default that the servicer must attempt a **live contac**t with the borrower. Plaintiff allged that there was no strict compliance with paragraphs 22 of the mortgage or R.I.G.L. 34-11-22 or 34-7-4, thus rendering the foreclosure attempt void. There was no compliance with RESPA 12 C.F.R. 1024.41(f) which precluded taking the first action in regard to a foreclosure action until at the loan was in default  120 days.  Finally  the  Plaintiff's Mortgage was sold to a securitized FHA mortgage loan trust and there is no dispute that this loan became a Ginnie Mae/FHA mortgage.

The Plaintiff will be amending his complaint to include additional RESPA claims for failure to correct errors due to noncompliance with 12 C.F.R. 1024.35. This amended complaint will be filed prior to the hearing. However the Notices of Error which will be asserted are as follows:

 The First Notice of Error was mailed to Rocket Mortgage on  January 31, 2025, which asserted an error that the January 24, 2025 sale should not have occurred  due to the following errors:

An FHA mortgage, requires strict compliance with the terms of the

mortgage and with the HUD regulations require that before FHA mortgage is accelerated and a foreclosure sale occurs a face to face meeting is required along with compliance with other HUD guidelines. Plaintiff obtained documents from Rocket Mortgage, which indicate that Rocket Mortgage advertises in Rhode Island and Massachusetts and has an Executive Loan Officer listed on the internet in Milford, Massachusetts (Patricia Lucini) and another Executive Loan Officer listed on the internet in Longmeadow, Massachusetts (Timoth Ryan). These Executive Loan Officers do work for Rocket Mortgage within 100 miles of Cranston, Rhode Island and within 200 miles of the Plaintiff's home. Rocket Mortgage does all its business on the internet so that it has no offices where employees work, but has all its employees work remotely from various locations.

Another RESPA error asserted was the fact that

the purported Notice of Foreclosure Sale did not strictly comply with the terms of the mortgage and R.J.G.L. 34-27-4. This purported unsigned notice was mailed by a mail vendor for Brock and Scott PLLC, which company has no authority to print or mail a Notice of Sale on behalf of Rocket Mortgage, LLC. The response by Rocket Mortgage did not address this issue.

Another error asserted in the first notice of error was that Rocket Mortgage

never advised the consumers of all applicable loss mitigation options pursuant to the regulations of the Secretary of HUD. It sent the Plaintiff a notice after a

purported Notice of Sale had been mailed suggesting that the consumer fill out a

mortgage assistance application. This was an error because under

the FHA HUD guidelines, the consumer is not required to fill out a mortgage

application to obtain loss mitigation and the communication was sent too late for

any response as it was mailed so that Rocket Mortgage could deny the loss

mitigation due to a pending sale as allowed by 12 C.F.R. 1024.41.

This notice of error also asserted an error by not calling the Plaintiff for loss

mitigation options.

It also alleged an error because Rocket Mortgage did not comply

with 12 CFR 1024.41(1), which states:

(1)  Pre-foreclosure review period. A servicer shall not make the

first notice or filing required by applicable law for any judicial or non-

judicial foreclosure process unless:

(i)   A borrower's mortgage loan obligation is more than 120 days delinquent;

The first Notice required by Rhode Island law for a foreclosure was the Notice of

Mediation, attached which you mailed to the consumer dated August 22, 2024. At

this time the consumer was due for the May 1, 2024

payment and was not 120 days delinquent when the Notice of Mediation was

mailed. Pursuant to R.I.G. 34-27-9, this was the first activity required in the foreclosure process.

Another error asserted was that the mortgage was assigned to a Ginnie Mac Pool of loans and Rocket Mortgage is not the actual mortgagee for this FHA loan.

Another error asserted was that Rocket Mortgage did not accelerate the mortgage note and as a result could not foreclose on the full amount due. The Notice of Error asserted that the mortgage was not strictly complied with by the Defendant in the default and acceleration process.

Another error asserted was that under the HUD guidelines the consumer should have been provided a standalone FHA partial claim for the past due mortgage arrearage and should have been notified of that Joss mitigation option or any other loss mitigation option to retain his home.

Finally Rocket Mortgage was requested under RESPA to correct these errors by rescinding the foreclosure sale by notifying the purported bidder that the sale has been rescinded, refunding the deposit made by him and by removing all fees and

On April 4, 2025, another Notice of Error was mailed to Rocket Mortgage asserting the following errors:

The consumer believes that you have committed error by scheduling and conducting a purported foreclosure sale on January 24, 2025 without strictly complying with the terms of the mortgage. You committed error because this mortgage is an FHA mortgage, which requires strict compliance with the terms of

the mortgage and with the HUD regulations. The provisions of the mortgage in relation to declaration of default and acceleration were not complied with by the owner of the note and mortgage. Before any alleged acceleration of the loan was declared, the Lender, or its assignee, was required to comply with the terms of the mortgage. Paragraph 9 of the Plaintiff's Mortgage did not authorize acceleration or foreclosure if not permitted by the Secretary of the Secretary of Housing and Urban Development. These regulations provide that the mortgagee must have a face-to-face meeting with the mortgagor or make a reasonable effort to arrange such a meeting, before three full monthly installments due on the mortgage are unpaid.

No such face-to-face meeting occurred nor was attempted nor scheduled with the consumer. This regulation was not complied with by any mortgagee before any alleged acceleration of the loan was declared. In order to accelerate and exercise the statutory power of sale, the mortgagee was required to comply with 24 CFR §203.604, which provides:

203.604 Contact with the mortgagor.

(a) [Reserved]

(b)    The mortgagee must have a face-to-face interview with the mortgagor or make a reasonable effort to arrange such a meeting, before three full monthly installments due on the mortgage are unpaid.

( emphasis added) If default occurs in a repayment plan arranged other than during a personal interview, the mortgagee must have a face-to-face meeting with the mortgagor, or make a reasonable attempt to arrange such a meeting within 30 days after such default and at least 30 days before foreclosure is commenced, or at least 30 days before assignment is requested if the mortgage is insured on Hawaiian home land pursuant to section 247 or Indian land pursuant to section 248 or if assignment is requested under § 203

.350(d) for mortgages authorized by section 203(q) of the National Housing Act.

(c)     A face-to-face meeting is not required if:

(1)     The mortgagor does not reside in the mortgaged property,

(2)     The mortgaged property is not within 200 miles of the mortgagee, its servicer, or a branch office of either,

(3)     The mortgagor has clearly indicated that he will not cooperate in the interview,

(4)     A repayment plan consistent with the mortgagor's circumstances is entered into to bring the mortgagor's account current thus making a meeting unnecessary, and payments thereunder are current, or

(5)     A reasonable effort to arrange a meeting is unsuccessful.

(d)     A reasonable effort to arrange a face-to-face meeting with the mortgagor shall consist at a minimum of one letter sent to the mortgagor certified by the Postal Service as having been dispatched. Such a reasonable effort to arrange a face-to-face meeting shall also include at least one trip to see the mortgagor at the mortgaged property, unless the mortgaged property is more than 200 miles from the mortgagee, its servicer, or a branch office of either, or it is known that the mortgagor is not residing in the mortgaged property.

(e)      (1) For mortgages insured pursuant to section 248 of the National Housing Act, the provisions of paragraphs (b), (c) and (d) of this section are applicable, except that a face-to-face meeting with the mortgagor is required, and a reasonable effort to arrange such a meeting shall include at least one trip to see the mortgagor at the mortgaged property, notwithstanding that such property is more than 200 miles from the mortgagee, its servicer, or a branch office of either. In addition, the mortgagee must document that it has made at least one telephone call to the mortgagor for the purpose of trying to arrange a face-to-face interview.  The mortgagee may appoint an agent to perform its responsibilities under this paragraph.

(2) The mortgagee must also:

(i)      Inform the mortgagor that HUD will make information regarding the status and payment history of the mortgagor's loan available to local credit bureaus and prospective creditors.

(ii)      Inform the mortgagor of other available assistance, if any.

(iii)      Inform the mortgagor of the names and addresses of HUD officials to whom further communications may be addressed.

Specifically, the provisions in paragraph 9 of the mortgage were a condition precedent to the exercise of the power of sale of the mortgage.

The consumer's mortgage incorporated the HUD regulations, which required a face-to-face meeting before declaration of default and acceleration.

You committed error because you did not comply with the terms of the mortgage to exercise the statutory power of sale as indicated above and the consumer was not provided the opportunity to have a face to face  and the loan was not accelerate default letter was sent to consumer after a face to face meeting which  had occurred or which had been scheduled by  and had been rejected by Plaintiff.

You committed error because you never made a visit to the home of the consumer to solicit him for a  face-to-face meeting with a representative of them or any other entity acting on their behalf.

You committed error because you never sent the consumers a default notice nor an acceleration notice after they had been provided a face-to-face meeting.

Due to this failure to comply with the terms of the mortgage, no entity was contractually authorized to exercise the statutory power of sale and foreclose on the consumer's  mortgage.

You also committed error because the purported Notice of Foreclosure Sale did not strictly comply with the terms of the mortgage and R.I.G.L. 34-27-4 .  This purported unsigned notice waws mailed by a mail vendor for Brock and Scott PLLC, which company has no authority to print or mail a Notice of Sale on behalf of Rocket Mortgage, LLC.

You also committed because this law firm mailed the purported Notice of Sale by certified mail electronic receipt instead of certified mail return receipt requested to save money on the mailing, As a result this sale is void pursuant to R.I.G.L. 34-27-11 and 34-27-4.

You also committed error because you have never advised the consumer of all loss mitigation options available pursuant to the regulations of the Secretary of HUD. You sent a notice after a purported Notice of Sale had been mailed suggesting that the consumer fill out a mortgage assistance application. This was an error because under the FHA HUD guidelines, the consumer is not required to fill out a mortgage application to obtain loss mitigation.

You also committed error by not calling the consumer or sending an employee or agent  to the consumer's home for a Loss Mitigation Consultation or Face to Face meeting. The HUD guidelines required that you call the consumer each month upon the consumer is in default. You did not call the consumer at any time, contrary to the HUD guidelines.

You also committed an error because the December 2, 2024 notice to the consumer demanding an application in violation of the HUD Regulations requested that the consumer provide an application by January 2, 2025 even though 12 CFR 1024.41 allows you not to consider loss mitigation applications received less then 45 days prior to a foreclosure sale.

You also committed an error by not complying with 12 CFR 1024.41(1), which states

(1) Pre-foreclosure review period. A servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:

(i) A borrower's mortgage loan obligation is more than 120 days delinquent.

The first Notice required by Rhode Island law for a foreclosure was the Notice of Mediation, attached which you mailed to the consumer dated August 22, 2024. At this time the consumer was due for the May 1, 2024 payment and was  not 120 days delinquent when you mailed the Notice of Mediation.

You also committed error because the promissory note executed by the consumers has never been endorsed and as a result you cannot declare the note in default and cannot accelerate the note or mortgage.

You also committed error because the mortgage was assigned to a Ginnie Mae Pool of loans and Rocket Mortgage is not the actual mortgagee for this FHA loan.

You also committed error because you did not accelerate the mortgage note or mortgage and thus could not foreclose.

You also committed error because under the HUD guidelines the consumer should have been provided a standalone FHA partial claim for the past due mortgage arrearage  and should have been notified of that loss mitigation option or any other loss mitigation option to retain his home.

Please correct these errors by rescinding the foreclosure sale, by notifying the purported bidder that the sale has been rescinded, refunding the deposit made by him and by removing all fees and expenses attributable to this purported foreclosure and all previous foreclosures.

Rocket Mortgage did not correct with of these errors pursuant to RESPA. Plaintiff

subsequently had requested that Rocket Mortgage provide all documents on which

it based its assertion that no error had been committed in the sale process. Rocket

Mortgage refused to respond prompting an additional Notice of Error regarding its

failure to document why this sale was not an error. On   May 13, 2025 another

Notice of Error  was mailed to Rocket Mortgage which stated:

 The consumer believes that you have committed error by not providing  all documents on which you based your assertion that no error had occurred within 15 business days of receipt. You received this Request for Information on February

27, 2025 at your designated address of P.O. Box 442359, Detroit, MI 48244, as indicated by USPS tracking receipt number  9481711898765456846607, attached to this Notice of Error.

You committed error in your response dated March 3, 2025 in which you stated that:

We have determined that we are unable to provide the information you are requesting for the following reasons:

You letter is duplicative. You have previously requested this information and we responded on February 26, 2025.

Should you have additional questions or concerns, please contact the foreclosure attorney, Brock & Scott, PLLC. Brock & Scott, PLLC can be reached at (336) 354-1200. A copy of the previous response is enclosed for your reference

 This response is an error because you  could not have provided the information requested on February 26, 2025 because you did not receive the Request for Information until February 27, 2025.

 You committed error by stating a generic response that the information requested was duplicative. This Request for Information has never been answered by you and it is not duplicative as there never has been a response and you have not provided the following information:

 The consumer request that you provide within 15 business days of receipt for this Request for Information the following documents:

 All documents reviewed by you on which you based your assertion that you did not commit error by scheduling and conducting a purported foreclosure sale on January 24, 2025.

All documents reviewed by you on which you based your assertion that you did not commit error because you strictly complied with the terms of the mortgage and the FHA regulations.

All documents reviewed by you on which you based your assertion that you did not commit error because you did comply with paragraph 9 of the mortgage.

All documents reviewed by you on which you based your assertion that you did not commit error because you complied with all regulations of the Secretary of Housing and Urban Development and had a face to face meeting with the mortgagor.

All documents reviewed by you on which you based your assertion that you did made a reasonable effort to arrange a face meeting with the mortgagor.

All documents reviewed by you on which you based your assertion that you did not commit error because you claim to have complied with 24 CFR §203.604.

All documents reviewed by you on which you based your assertion that you did not commit error because you mailed a certified letter to the mortgagor seeking a face to face meeting and advising the mortgagor of all loss mitigation options to avoid foreclosure, including a partial claim.

All documents reviewed by you on which you based your assertion that you did not commit error that you made at least one trip to see the mortgagor at this property address.

All documents reviewed by you on which you based your assertion that you did not commit error because you did  inform the mortgagor that HUD will make information regarding the status and payment history of the mortgagor's loan available to local credit bureaus and prospective creditors.

All documents reviewed by you on which you based your assertion that you did not commit error because you did inform the mortgagor of other available assistance, if any, including the availability of a partial claim.

All documents reviewed by you on which you based your assertion that you did not commit error because it is your assertion that  the provisions in paragraph 9 of the mortgage were not a condition precedent to the exercise of the power of sale of the mortgage.

All documents reviewed by you on which you based your assertion that you did not commit error because you assert that you were not  required to have a  face-to-face meeting before declaration of default and acceleration.

All documents reviewed by you on which you based your assertion that you did not commit error because the  purported Notice of Foreclosure Sale did not have to be mailed by Certified Mail Return Receipt Request.

All documents reviewed by you on which you based your assertion that you did not commit error because it is your assertion that the purported Notice of Sale did not have to be signed.

All documents reviewed by you on which you based your assertion that you did not commit error because it is your assertion  the purported Notice of Sale could be prepared and mailed by the mail vendor for Brock & Scott PLLC.

All documents reviewed by you on which you based your assertion that you did not commit error because it is your assertion that  you actually  advised the consumers of all loss mitigation options available pursuant to the regulations of the Secretary of HUD.

All documents reviewed by you on which you based your assertion that you did not commit error because it is your contention that the consumer is not required under FHA HUD guidelines to fill out a mortgage assistance application.

All documents reviewed by you on which you based your assertion that you did not commit error by mailing a December 2, 2024 Notice to fill out a loss mitigation application by January 2, 2025  to the consumer after the purported Notice of Sale had been mailed and within 45 days of the purported foreclosure sale.

All documents reviewed by you on which you based your assertion that you did not commit error by not calling the consumer or sending an employee or agent  to the consumer's home for a Loss Mitigation Consultation or Face to Face meeting.

All documents reviewed by you on which you based your assertion that you did not commit error because it is your contention that you complied with  12 CFR 1024.41(1), which states

(1) Pre-foreclosure review period. A servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:

(i) A borrower's mortgage loan obligation is more than 120 days delinquent.

All documents reviewed by you on which you based your assertion that you did not commit error because you contend that the first Notice required by Rhode Island law for a foreclosure was the not Notice of Mediation, attached which you mailed to the consumer dated August 22, 2024.

All documents reviewed by you on which you based your assertion that you did not commit error because it is your contention that on August 22, 2024 the consumer was more than 120 days delinquent.

All documents reviewed by you on which you based your assertion that you did not commit error because you contend that the promissory note executed by the consumers has  been endorsed.

All documents reviewed by you on which you based your assertion that you did not commit error that is your contention that the mortgage was not assigned to a Ginnie Mae Pool of loan.

All documents reviewed by you on which you based your assertion that you did not commit error because you contend that Rocket Mortgage is not the actual owner of this FHA loan.

All documents reviewed by you on which you based your assertion that you did not commit error because you actually accelerated the  mortgage note or mortgage.

All documents reviewed by you on which you based your assertion that you did not commit error  because you assert that under the HUD guidelines the consumer should not have been provided a standalone FHA partial claim for the past due mortgage arrearage  and should not have been notified of that loss mitigation option or any other loss mitigation option to retain his home.

All documents reviewed by you on which you based your assertion that you did not commit error by not  rescinding the foreclosure sale.

All documents reviewed by you on which you based your assertion that you did not commit error not notifying the purported bidder that the sale has been rescinded.

All documents reviewed by you on which you based your assertion that you did not commit error by not refunding the deposit made by the high bidder.

All documents reviewed by you on which you based your assertion that you did not commit error by not removing all fees and expenses attributable to this purported foreclosure and all previous foreclosures.

 Please correct this error by providing these documents upon receipt of this Notice of Error. You have committed error by not complying with 12 C.F.R. 1024.35, which states:

14

(4) Copies of documentation. A servicer shall provide to the borrower, at no charge, copies of documents and information relied upon by the servicer in making its determination that no error occurred within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receiving the borrower's request for such documents. A servicer is not required to provide documents relied upon that constitute confidential, proprietary or privileged information. If a servicer withholds documents relied upon because it has determined that such documents constitute confidential, proprietary or privileged information, the servicer must notify the borrower of its determination in writing within 15 days (excluding legal public holidays, Saturdays, and Sundays) of receipt of the borrower's request for such documents.

Defendant has not made a reasonable effort to respond to these notices of error and these failures to correct error will be the subject of Plaintiff's amended complaint.

Plaintiff gave the Defendant the opportunity to correct these errors prior to filing the complaint in this case.

Rocket Mortgage has not demonstrated that it has complied with 12 C.F.R 1024.39 by making live contact or attempting to make live contact with the Plaintiff prior to commencing the foreclosure process.  This RESPA  regulation,  a violation of which was  pleaded in the original complaint requires the following from Rocket Mortgage:

**Live contact.** Except as otherwise provided in this section, a servicer shall establish or make good faith efforts to establish live contact with a delinquent borrower no later than the 36th day of a borrower's delinquency and again no later than 36 days after each payment due date so long as the borrower remains delinquent. Promptly after establishing live contact with a borrower, the servicer shall inform the borrower about the availability of loss mitigation options, if

appropriate, and take the actions described in paragraph 39(e) of this section, if applicable.

(a) **Notice required.** Except as otherwise provided in this section, a servicer

shall provide to a delinquent borrower a written notice with the information set forth in paragraph (b)(2) of this section no later than the 45th day of the borrower's delinquency and again no later than 45 days after each payment due date so long as the borrower remains delinquent. A servicer is not required to provide the written notice, however, more than once during any 180-day period. If a borrower is 45 days or more delinquent at the end of any 180-day period after the servicer has provided the written notice, a servicer must provide the written notice again no later than 180 days after the provision of the prior written notice. If a borrower is less than 45 days delinquent at the end of any 180-day period after the servicer has provided the written notice, a servicer must provide the written notice again no later than 45 days after the payment due date for which the borrower remains delinquent.

The Consumer Financial Protection Bureau has provided the Official interpretation

of 39(a) in regard to Live Contact:

1. **Delinquency.** Section 1024.39 requires a servicer to establish or attempt to establish live contact no later than the 36th day of a borrower's delinquency. This provision is illustrated as follows:

i. Assume a mortgage loan obligation with a monthly billing cycle and monthly payments of $2,000 representing principal, interest, and escrow due on the first of each month.

A. The borrower fails to make a payment of $2,000  and makes no payment during the 36-day period after January 1. The servicer must establish or make good faith efforts to establish live contact not later than 36 days after January 1 - **i.e.,** on or before February 6.

B. The borrower makes no payments during the period January 1 through April 1, although payments of $2,000 each on January 1, February 1, and March 1 are due. Assuming it is not a leap year, the borrower is 90 days delinquent as of April 1.

The servicer may time its attempts to establish live contact such that a single attempt will meet the requirements of § 1024.39(a) for two missed payments. To illustrate, the servicer complies with § 1024.39(a) if the servicer makes a good faith effort to establish live contact with the borrower, for example, on February 5 and again on March 25. The February 5 attempt meets the requirements of § 1024.39(a) for both the January 1 and February 1 missed payments. The March 25 attempt meets the requirements of § 1024.39(a) for the March 1 missed payment.

ii. A borrower who is performing as agreed under a loss mitigation option designed to bring the borrower current on a previously missed payment is not delinquent for purposes of § 1024.39.

iii. During the 60-day period beginning on the effective date of transfer of the servicing of any mortgage loan, a borrower is not delinquent for purposes of § 1024.39 if the transferee servicer learns that the borrower has made a timely payment that has been misdirected to the transferor servicer and the transferee servicer documents its files accordingly. **See** § 1024.33(c)(1) and comment 33(c)(1)-2.

iv. A servicer need not establish live contact with a borrower unless the borrower is delinquent during the 36 days after a payment due date. If the borrower satisfies a payment in full before the end of the 36-day period, the servicer need not establish live contact with the borrower. For example, if a borrower misses a January 1 due date but makes that payment on February 1, a servicer need not establish or make good faith efforts to establish live contact by February 6.

2. **Establishing live contact.** Live contact provides servicers an opportunity to discuss the circumstances of a borrower's delinquency. **Live contact with a borrower includes speaking on the telephone or conducting an in-person meeting with the borrower but not leaving a recorded phone message**. A servicer may rely on live contact established at the borrower's initiative to satisfy the live contact requirement in § 1024.39(a). Servicers may also combine contacts made pursuant to § 1024.39(a) with contacts made with borrowers for other reasons, for instance, by telling borrowers on collection calls that loss mitigation options may be available.

The Regulation distinguishes between the live contact within the first 36 days of

default and written communication after 45 days. The Regulation clearly does not

state that a written communication must be sent within 36 days. Rocket Mortgage

in its response has ignored this distinction and has not provided any information to

the Court that any phone calls were made within thirty six days. Plaintiff

subpoenaed the records, to which Rocket Mortgage has filed a Motion to Quash.

Regulation F requires that the all phone call records be kept.

12 CFR 1024.38 indicates what must be provided in the servicing file and

how a servicer  must respond to a Request for Information for the  Servicing File:

## 38(c)(2) Servicing file.

1. **Timing.** A servicer complies with § 1024.38(c)(2) if it maintains information in a manner that facilitates compliance with § 1024.38(c)(2) beginning on or after January 10, 2014. A servicer is not required to comply with § 1024.38(c)(2) with respect to information created prior to January 10, 2014. For example, if a mortgage loan was originated on January 1, 2013, a servicer is not required by § 1024.38(c)(2) to maintain information regarding transactions credited or debited to that mortgage loan account in any particular manner for payments made prior to January 10, 2014. However, for payments made on or after January 10, 2014, a servicer must maintain such information in a manner that facilitates compiling such information into a servicing file within five days.

2. **Borrower requests for servicing file.** Section 1024.38(c)(2) does not confer upon any borrower an independent right to access information contained in the servicing file. Upon receipt of a borrower's request for a servicing file, a servicer shall provide the borrower with a copy of the information contained in the servicing file for the borrower's mortgage loan, subject to the procedures and limitations set forth in § 1024.36.

Paragraph 38(c)(2)(iv).

1. **Report of data fields.** A report of the data fields relating to a borrower's mortgage loan account created by the servicer's electronic systems in connection

with servicing practices means a report listing the relevant data fields by name, populated with any specific data relating to the borrower's mortgage loan account. Examples of data fields relating to a borrower's mortgage loan account created by the servicer's electronic systems in connection with servicing practices include fields used to identify the terms of the borrower's mortgage loan, fields used to identify the occurrence of automated or manual collection calls, fields reflecting the evaluation of a borrower for a loss mitigation option, fields used to identify the owner or assignee of a mortgage loan, and any credit reporting history.

Plaintiff requested the servicing file through a Request for Information.

However Rocket Mortgage refused to provide the servicing file insisting that this

Request  was  overbroadtating:

After reviewing your letter, we determined that we are unable to provide some of

the information you are requesting for the following reasons:

• Your letter is overbroad, meaning, you have requested a great deal of

information that is not reasonably likely to assist you with the account.

• Your letter is overbroad, meaning, that you have styled your letter in the form of

a legal notice or pleading, which requests a great deal of information, and we

are unable to identify a valid concern.

This response by Rocket Mortgage was similar to its assertion in the Motion to

Quash the Subpoena. This information was not overbroad nor unduly burdensome.

The CFPB has defined both terms for purposes of RESPA compliance:

**iv) Overbroad or unduly burdensome information request.** The information

request is overbroad or unduly burdensome. An information request is overbroad if

a borrower requests that the servicer provide an unreasonable volume of

19

documents or information to a borrower. An information request is unduly

burdensome if a diligent servicer could not respond to the information request

without either exceeding the maximum time limit permitted by paragraph (d)(2) of

this section or incurring costs (or dedicating resources) that would be unreasonable

in light of the circumstances. To the extent a servicer can reasonably identify a

valid information request in a submission that is otherwise overbroad or unduly

burdensome, the servicer shall comply with the requirements of paragraphs (c) and

(d) of this section with respect to that requested information.

 The time frame for determining unduly or burdensome is thirty business

days, the amount of time to respond to Requests for Information or Notices of

Error. The CFPB in its Official Interpretations elaborated on what constitutes

unduly or burdensome :

1. **Examples of overbroad or unduly burdensome requests for information.** The
following are examples of requests for information that are overbroad or unduly
burdensome:

i. Requests for information that seek documents relating to substantially all aspects
of mortgage origination, mortgage servicing, mortgage sale or securitization, and
foreclosure, including, for example, requests for all mortgage loan file documents,
recorded mortgage instruments, servicing information and documents, and sale or
securitization information and documents;

ii. Requests for information that are not reasonably understandable or are included
with voluminous tangential discussion or assertions of errors;

iii. Requests for information that purport to require servicers to provide
information in specific formats, such as in a transcript, letter form in a columnar
format, or spreadsheet, when such information is not ordinarily stored in such
format; and

iv. Requests for information that are not reasonably likely to assist a borrower with the borrower's account, including, for example, a request for copies of the front and back of all physical payment instruments (such as checks, drafts, or wire transfer confirmations) that show payments made by the borrower to the servicer and payments made by a servicer to an owner or assignee of a mortgage loan.

The Defendant is merely seeking to hide the actual loan servicing file which contains all of the documents and which contains all references to phone calls, the persons who made the calls and all loss mitigation discussions if any. Rocket Mortgage has not denied that no live contact was attempted but instead has focused on purported letters, without providing any documents.

CFPB interpretation of good faith efforts to establish live contact also were not complied with by Rocket Mortgage:

3. **Good faith efforts.** Good faith efforts to establish live contact consist of reasonable steps, under the circumstances, to reach a borrower and may include telephoning the borrower on more than one occasion or sending written or electronic communication encouraging the borrower to establish live contact with the servicer. The length of a borrower's delinquency, as well as a borrower's failure to respond to a servicer's repeated attempts at communication pursuant to § 1024.39(a), are relevant circumstances to consider. For example, whereas "good faith efforts" to establish live contact with regard to a borrower with two consecutive missed payments might require a telephone call, "good faith efforts" to establish live contact with regard to an unresponsive borrower with six or more consecutive missed payments might require no more than including a sentence requesting that the borrower contact the servicer with regard to the delinquencies in the periodic statement or in an electronic communication. However, if a borrower is in a situation such that the additional live contact information is required under § 1024.39(e) or if a servicer relies on the temporary special COVID-19 loss mitigation procedural safeguards provision in § 1024.41(f)(3)(ii)(C)(1), providing no more than a sentence requesting that the borrower contact the servicer with regard to the delinquencies in the periodic statement or in an electronic communication would not be a reasonable step, under

the circumstances, to make good faith efforts to establish live contact. Comment 39(a)-6 discusses the relationship between live contact and the loss mitigation procedures set forth in § 1024.41.

**4. Promptly inform if appropriate.**

i. **Servicer's determination.** Except as provided in § 1024.39(e), it is within a servicer's reasonable discretion to determine whether informing a borrower about the availability of loss mitigation options is appropriate under the circumstances. The following examples demonstrate when a servicer has made a reasonable determination regarding the appropriateness of providing information about loss mitigation options.

A. A servicer provides information about the availability of loss mitigation options to a borrower who notifies a servicer during live contact of a material adverse change in the borrower's financial circumstances that is likely to cause the borrower to experience a long-term delinquency for which loss mitigation options may be available.

B. A servicer does not provide information about the availability of loss mitigation options to a borrower who has missed a January 1 payment and notified the servicer that full late payment will be transmitted to the servicer by February 15.

ii. **Promptly inform.** If appropriate, a servicer may inform borrowers about the availability of loss mitigation options orally, in writing, or through electronic communication, but the servicer must provide such information promptly after the servicer establishes live contact. Except as provided in § 1024.39(e), a servicer need not notify a borrower about any particular loss mitigation options at this time; if appropriate, a servicer need only inform borrowers generally that loss mitigation options may be available. If appropriate, a servicer may satisfy the requirement in § 1024.39(a) to inform a borrower about loss mitigation options by providing the written notice required by § 1024.39(b)(1), but the servicer must provide such notice promptly after the servicer establishes live contact.

5. **Borrower's representative.** Section 1024.39 does not prohibit a servicer from satisfying its requirements by establishing live contact with and, if applicable, providing information about loss mitigation options to a person authorized by the borrower to communicate with the servicer on the borrower's behalf. A servicer may undertake reasonable procedures to determine if a person that claims to be an agent of a borrower has authority from the borrower to act on the borrower's

behalf, for example, by requiring a person that claims to be an agent of the borrower to provide documentation from the borrower stating that the purported agent is acting on the borrower's behalf.

6. **Relationship between live contact and loss mitigation procedures.** If the servicer has established and is maintaining ongoing contact with the borrower under the loss mitigation procedures under § 1024.41, including during the borrower's completion of a loss mitigation application or the servicer's evaluation of the borrower's complete loss mitigation application, or if the servicer has sent the borrower a notice pursuant to § 1024.41(c)(1)(ii) that the borrower is not eligible for any loss mitigation options, the servicer complies with § 1024.39(a) and need not otherwise establish or make good faith efforts to establish live contact. When the borrower is in a forbearance program made available to borrowers experiencing a COVID-19-related hardship such that the additional live contact information is required under § 1024.39(e)(2) or if a servicer relies on the temporary special COVID-19 loss mitigation procedural safeguards provision in § 1024.41(f)(3)(ii)(C)(1), the servicer is not maintaining ongoing contact with the borrower under the loss mitigation procedures under § 1024.41 in a way that would comply with § 1024.39(a) if the servicer has only sent the notices required by § 1024.41(b)(2)(i)(B) and (c)(2)(iii) and has had no further ongoing contact with the borrower concerning the borrower's loss mitigation application. A servicer must resume compliance with the requirements of § 1024.39(a) for a borrower who becomes delinquent again after curing a prior delinquency.

See interpretation of 39(a) Live contact. in Supplement I

The live contact must be attempted within thirty six days of the default. It was not attempted as the Defendant only referenced letters in the affidavit which did not contain any documentation of any phone calls.

LOSS MITIGATION OPTIONS WERE AVAILABLE TO THE PLAINTIFF

Rocket Mortgage has falsely stated that the Plaintiff cannot avail himself of loss mitigation procedures because he had already utilized a partial claim loss

mitigation for a prior default. However the prior partial claim was loss mitigation for a prior default and did not preclude an additional application for a subsequent default.  FHA Mortgagee Letter 2024-02 created a new loss mitigation program when the 30% of the loan principal balance maximum  partial claim loss mitigation option had been met. This Mortgagee Letter stated:

The provisions of this ML may be implemented starting May 1, 2024, and must be implemented no later than January 1, 2025. All updates will be incorporated into a forthcoming update of the HUD Handbook 4000.1, FHA Single Family Housing Policy Handbook.

This Mortgagee Letter referenced the Partial Claim eligibility with this new option for loss mitigation effective May 1, 2024, which was not considered by the Defendant:

 (i) Step 1 – Calculate Partial Claim Availability The Mortgagee must determine the maximum Partial Claim amount available for the Payment Supplement. The Payment Supplement, in addition **to any other existing Partial Claim**, must not exceed the Statutory Maximum for Partial Claims (III.A.2.k.v(F)(1)). The Mortgagee must calculate the statutory maximum for Partial Claims, and then subtract any outstanding Partial Claim balances to determine the amount available for the Payment Supplement.

The Plaintiff's  mortgage does not have all of the FHA language as do other mortgages on occasion. However a review of the promissory note indicates

that  this note is an  FHA note and mortgage number 451-1647068-703. The FHA

guidelines require that  FHA notes have a 4% late fee as provided in this

note.   The mortgage also references the same FHA number 451-1647068-703 and

has a definition of Secretary as the Secretary of the United States Department of

Housing and Urban Development on page 2 of the mortgage. The mortgage on

page six in paragraph 2 indicates application of payments and  indicates that when

payments are made the first payment shall be "to the Mortgage Insurance

premiums to be paid by Lender to the Secretary of the monthly charge by the

Secretary instead of the monthly mortgage insurance premiums.

Other indications that this loan is a FHA loan is  the fact that in 2023, the Plaintiff

was provided a FHA partial claim, which was recorded on his property and the fact

that Exhibit D, the purported default letter indicates that Rocket Mortgage was a

loan servicer acting on behalf of Ginnie Mae   II.  As alleged in the complaint and

Motion, Ginnie Mae is a government agency that guarantees timely payments to

investors in Mortgage-Backed Securities (MBS) backed by government-insured or

guaranteed mortgages. Ginnie Mae II MBS pools are securities issued by approved

lenders that contain various types of government-backed mortgages, such as

single-family level-payment, graduated payment, growing equity, manufactured

home, and adjustable rate mortgages. In essence, government-insured or

guaranteed mortgage loans are pooled into Ginnie Mae II MBS, which are then guaranteed by Ginnie Mae and sold to investors.

The Ginnie Mae website contains an explanation of the nature of the Ginnie Mae II Pool of loans at the following weblink:

https://www.ginniemae.gov/products_programs/products/single_class_securities/Pages/ginnie_mae_II.aspx#:~:text=Ginnie%20Mae%20II%20Key%20Program%20Provisions%20*,Single%2Dfamily%20adjustable%20rate%20mortgages%20(FHA%20or%20VA).     As a condition of the insuring of the mortgage loans in the MSP pool of Ginnie Mae II, including Plaintiff's mortgage, Rocket Mortgage was required to comply with all HUD regulations for loss mitigation and other servicing guidelines. These HUD regulations required the following actions by Rocket Mortgage before accelerating the mortgage loan and foreclosing on the mortgage:

a. For FHA-insured loans, loan servicers have specific contact requirements for delinquent borrowers:

b. Telephone Contact with a borrower was required and Rocket Mortgage had to initiate calls by the 20th day of delinquency, calling at least twice weekly at varying times until contact is made or the property is vacant.

c. Live Contact Attempt with the borrower   was required either by  phone or in-person by the 36th day of delinquency and again 36 days after each missed payment as long as the borrower is delinquent.

d. Written Notice was required to be sent by the 45th day of delinquency and again 45 days after each missed payment as long as the borrower is delinquent.

e. A Face-to-Face Interview had to be attempted or Rocket Mortgage had to make a reasonable effort to arrange a face-to-face interview by the 61st day of delinquency.

f. Servicers such as Rocket Mortgage were required to contact borrowers early in the delinquency cycle.

g. By the 45th day of delinquency, servicers must assign personnel to assist the borrower and be available to discuss options.

h. Servicers must inform borrowers about loss mitigation options during live contact

Thus Rocket Mortgage was  required to offer and communicate with the Plaintiff regarding the loss mitigation options indicated in the Regulations, which were the following:

a.      Deeds in lieu of foreclosure

b.      preforeclosure sales

c.     assumptions

d.     special forbearance

e.     recasting of mortgages

f.     partial claims

As alleged in the complaint, these efforts to contact the borrower via phone

must continue at least twice per week until contact is established or the servicer

determines the property is vacant or abandoned. These contact attempts should be

made at varying times and days of the week, and must be documented.

These requirements are located in the Code of Federal Regulations, which

provide:

203.605 Loss mitigation performance.

(a)Duty to mitigate. Before four full monthly installments due on the mortgage
have become unpaid, the mortgagee shall evaluate on a monthly basis all of the
loss mitigation techniques provided at § 203.501 to determine which is appropriate.
Based upon such evaluations, the mortgagee shall take the appropriate loss
mitigation action. Documentation must be maintained for the initial and all
subsequent evaluations and resulting loss mitigation actions. Should a claim for
mortgage insurance benefits later be filed, the mortgagee shall maintain this
documentation in the claim review file under the requirements of § 203.365(c).

(b)Assessment of mortgagee's loss mitigation performance.

(1) HUD will measure and advise mortgagees of their loss mitigation performance
through the Tier Ranking System (TRS). Under the TRS, HUD will analyze each
mortgagee's loss mitigation efforts portfolio-wide on a quarterly basis, based on 12
months of performance, by computing ratios involving loss mitigation attempts,
defaults, and claims. Based on the ratios, HUD will group mortgagees in four tiers
(Tiers 1, 2, 3, and 4), with Tier 1 representing the highest or best ranking

mortgagees and Tier 4 representing the lowest or least satisfactory ranking mortgagees. The precise methodology for calculating the TRS ratios and for determining the tier stratification (or cutoff points) will be provided through FEDERAL REGISTER notice. Notice of future TRS methodology or stratification changes will be published in the FEDERAL REGISTER and will provide a 30-day public comment period.

(2) Before HUD issues each quarterly TRS notice, HUD will review the number of claims paid to the mortgagee. If HUD determines that the lender's low TRS score is the result of a small number of defaults or a small number of foreclosure claims, or both, as defined by notice, HUD may determine not to designate the mortgagee as Tier 3 or Tier 4, and the mortgagee will remain unranked.

(3) Within 30 calendar days after the date of the TRS notice, a mortgagee that scored in Tier 4 may appeal its ranking to the Deputy Assistant Secretary for Single Family or the Deputy Assistant Secretary's designee and request an informal HUD conference. The only basis for appeal by the Tier 4 mortgagee is disagreement with the data used by HUD to calculate the mortgagee's ranking. If HUD determines that the mortgagee's Tier 4 ranking was based on incorrect or incomplete data, the mortgagee's performance will be recalculated, and the mortgagee will receive a corrected tier ranking score.

(c)Assessment of civil money penalty. A mortgagee that is found to have failed to engage in loss mitigation as required under paragraph (a) of this section shall be liable for a civil money penalty as provided in § 30.35(c) of this title.


The HUD loss mitigation  regulations are contained at this section, §

203.501 Loss mitigation, which provides:

Mortgagees must consider the comparative effects of their elective servicing actions, and must take those appropriate actions which can reasonably be expected to generate the smallest financial loss to the Department. Such actions include, but are not limited to, deeds in lieu of foreclosure under § 203.357, pre-foreclosure sales under § 203.370, partial claims under § 203.414, assumptions under § 203.512, special forbearance under §§ 203.471 and 203.614, and recasting of mortgages under § 203.616. HUD may prescribe conditions and requirements for the appropriate use of these loss mitigation actions, concerning such matters as

owner-occupancy, extent of previous defaults, prior use of loss mitigation, and evaluation of the mortgagor's income, credit and property.

On February 21, 2024 HUD issued Mortgagee Letter 2024-02, which is attached to this Memorandum. This Mortgagee Letter established a new loss mitigation program for FHA insured loans.    This Mortgagee Letter (ML) established the Payment Supplement loss mitigation option. This Mortgage Letter provided the following loss mitigation option:

To that end, this ML establishes a new loss mitigation option, the Payment Supplement, which will combine a standalone Partial Claim to bring the Mortgage current with a new Monthly Principal Reduction (MoPR) payment. This will temporarily reduce the Borrower's monthly Mortgage Payment for a period of three years, without requiring the Mortgage to be modified. After the Payment Supplement Period ends, the Borrower will be responsible for resuming payment of the full monthly Principal and Interest (P&I) amount. HUD intends to make the Payment Supplement a permanent part of FHA's loss mitigation options and will incorporate language to do so in a future ML or as an update to Handbook 4000.1.

Another program which was required to be offered to the Plaintiff was in HUD Mortgagee Letter 2013-32 and  established that a partial claim loss mitigation option would be the total amount available which is the lesser of: 1)

30% of the outstanding unpaid principal balance less any previous Partial Claims paid on this mortgage; and 2) the sum of:

1. Arrearages;
2. Legal fees and foreclosure costs related to a canceled foreclosure action; and
3. Principal deferment (per below calculation).

The Plaintiff had a prior PHA partial claim in the amount of $54,743.90 which was provided in 2023.  The principal balance of the Plaintiff's mortgage loan at the time of default was $255,021.72. The maximum partial claim at the time of default was $76,506.52 less the prior partial claim of $54,743,90 which equaled $21,762.62.

Defendant contends that because the mortgage does not specifically incorporate the HUD regulations that the Plaintiff has no recourse. However the execution of an FHA mortgage carried with it obligations of Rocket Mortgage for the benefit of the Plaintiff borrower. He had enhanced loss mitigation rights and Rocket Mortgage and the Ginnie Mae pool had the benefit of an insured loan. The

The citation *of  In re Medaglia*, 402 B.R. 530, 532-533 (Bankr. DRI 2009) can be distinguished because that case involved the jurisdiction of a bankruptcy court and held:

Therefore, if the foreclosure sale did not violate applicable state law, it follows that when the gavel falls, the right to cure no longer exists. There is no suggestion in this case of any violation of, or noncompliance with applicable state law.

In *Woel v. Christiana Tr., as Tr. for Stanwich Mortg. Loan Tr. Series 2017-17*, 228 A.3d 339, 345 (R.I. 2020(, the Supreme Court set aside a sale which had occurred ten years earlier. Thus Medaglia's gavel rule has no applicability to a defective sale.

In brief this Motion should be granted as Rocket Mortgage did not comply with the HUD loss mitigation guidelines which were accepted by the Defendant as a condition of insurance for the loan and which were for the benefit of the direct beneficiary of these regulations, There was a failure to comply with 12 C.F.R. 1024.39 by calling the Plaintiff, which has not been complied with by Rocket Mortgage and which has not disputed that no calls were made. The default letter did not strictly comply with the terms of the mortgage as alleged in the complaint. Plaintiff has presented evidence which establishes noncompliance with the HUD Regulations and 12C.F.R. 1024.39. These alone support the claim for injunctive relief. No sale has been completed at this point in the process and there good cause to stop this sale from being completed. Plaintiff was and is eligible for Partial Claim Supplement modification, which Rocket Mortgage  must offer. The Plaintiff and HUD will both benefit from this injunction,

For these reasons this motion should be granted.

July 3, 2025                          AMERRISQUE TABLADA
                                      By his Attorney
                                      /s/ John B. Ennis
                                      JOHN B. ENNIS, ESQ. #2135
                                      1200 Reservoir Avenue
                                      Cranston, RI 02920
                                      (401) 943-9230

                                      Jbelaw75@gmail.com

        CERTIFICATE OF SERVICE


I certify that I served a copy of this Memorandum on all attorneys of record on July 3, 2025 by electronic filing.


/s/ John B. Ennis