UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

AMERRISQUE TABLADA

      VS                                1:25-CV-00284

ROCKET MORTGAGE
SEVEN DEUCE, LLC
GINNIE MAE II

       AMENDED COMPLAINT

       COUNT I

       COMPLAINT FOR DECLARATORY JUDGMENT

       Plaintiff, I, Amerrisque Tablada, by his attorney complains of defendants as

follows:

1. Plaintiff, Amerrisque Tablada,  is  resident of the State of Rhode Island

with an address of 63 W Shannock Road Richmond, RI 02875.

2. The plaintiff owns said real estate, located at 63 W Shannock Road

Richmond, RI 02875, along with his wife, Alicia Tablada

3. Plaintiff executed a promissory note to   Quicken Loans, Inc. on

November 13, 2019.  A copy of this promissory note is attached as Exhibit

A.

4. Defendant, Ginnie Mae II, a Government National Mortgage Association

mortgage pool is the owner of the mortgage note.

1

5. This Court has jurisdiction due to the fact that Ginnie Mae II is an

instrumentality of the United States Government and this Amended

Complaint  raises claims pursuant to the Real Estate Settlement and

Procedures Act and has jurisdiction to issue Declaratory Judgments

pursuant to the Declaratory Judgment Act.

6. As security for this promissory note, Plaintiff  and Alicia Tablada,

executed a mortgage to Mortgage Electronic Registration Services, Inc.

("MERS")  on November 13, 2019.

4. A copy of this mortgage is attached as Exhibit B.

5. This mortgage is an FHA mortgage with mortgage insurance

insured by the United States Department of Housing and Urban

Development. ("HUD").

6. Defendant, Rocket Mortgage, LLC is a Delaware corporation and a

third-party loan servicer, which was formerly called Quicken Mortgage.

7. Rocket Mortgage, LLC is the loan servicer for the owner of the

mortgage and promissory note that Plaintiff executed pursuant to an

assignment of mortgage from MERS to Rocket Mortgage.

8. Defendant,  Rocket Mortgage, LLC, ("Rocket Mortgage") is a limited

liability company organized under the laws of the state of Michigan.

9. Rocket Mortgage, LLC has never owned the Plaintiff's mortgage loan or note.

10.    Government National Mortgage Association ("Ginnie Mae") is a government-owned corporation that guarantees mortgage-backed securities (MBS) backed by loans insured or guaranteed by the U.S. government.

11.    The Federal Housing Administration (FHA) guarantees this loan.

12.    Ginnie Mae does not originate or invest in mortgage loans.

13.    Ginnie Mae is a government agency that guarantees timely payments to investors in Mortgage-Backed Securities (MBS) backed by government-insured or guaranteed mortgages.

14.    Plaintiff's mortgage and note have been transferred to Ginnie Mae II.

15.    Ginnie Mae II MBS pools are securities issued by approved lenders that contain various types of government-backed mortgages, such as single-family level-payment, graduated payment, growing equity, manufactured home, and adjustable rate mortgages.

16.    Ginnie Mae II MBS pools can be single-issuer or multiple-issuer, allowing smaller lenders to participate in the secondary market.

17.     In essence, government-insured or guaranteed mortgage loans are pooled into Ginnie Mae II MBS, which are then guaranteed by Ginnie Mae and sold to investors.

18.     The Ginnie Mae website contains an explanation of the nature of the Ginnie Mae II Pool of loans at the following weblink:

https://www.ginniemae.gov/products_programs/products/single_class_secu rities/Pages/ginnie_mae_II.aspx#:~:text=Ginnie%20Mae%20II%20Key%2 0Program%20Provisions%20*,Single%2Dfamily%20adjustable%20rate% 20mortgages%20(FHA%20or%20VA).

19.     Shortly after November 13, 2019,  Quicken Loans, Inc. transferred his note and mortgage to a Ginnie Mae pool of loans.

20.     Plaintiff's mortgage along with other mortgages was transferred by Quicken Loans to a Ginnie Mae II pool as part of the process of creating Mortgage-Backed Securities (MBS).

21.     Plaintiff's mortgage was then grouped into pools based on specific criteria set by Ginnie Mae.

22.     Quicken Loans was the issuer, a private entity approved by Ginnie Mae, which  was fully responsible for administering the securities and servicing the pooled mortgages.

23.      These duties included collecting payments, managing escrow accounts, and handling delinquencies pursuant to the HUD guidelines.

24.      Quicken Loans securitized the pooled mortgages to back the issuance of Ginnie Mae II MBS, which represents ownership interests in the underlying mortgage pool.

25.      Ginnie Mae guaranteed the timely payment of principal and interest to investors in these MBS, providing a layer of security backed by the full faith and credit of the U.S. government.

26.      Ginnie Mae authorized its transfer agent to create and deliver the guaranteed securities to investors, who then receive payments from the central paying and transfer agent based on the mortgage payments collected from the underlying pool.

27.      As a condition of the insuring of the mortgage loans in the MSP pool of Ginnie Mae II, including Plaintiff's mortgage, Rocket Mortgage was required to comply with all HUD regulations for loss mitigation and other servicing guidelines.

28.      These HUD regulations required the following actions by Rocket Mortgage before accelerating the mortgage loan and foreclosing on the mortgage:

a. For FHA-insured loans, loan servicers have specific contact requirements for delinquent borrowers:

b. Telephone Contact with a borrower was required and Rocket Mortgage had to initiate calls by the 20th day of delinquency, calling at least twice weekly at varying times until contact is made or the property is vacant.

c. Live Contact Attempt with the borrower   was required either by  phone or in-person by the 36th day of delinquency and again 36 days after each missed payment as long as the borrower is delinquent.

d. Written Notice was required to be sent by the 45th day of delinquency and again 45 days after each missed payment as long as the borrower is delinquent.

e. A Face-to-Face Interview had to be attempted or Rocket Mortgage had to make a reasonable effort to arrange a face-to-face interview by the 61st day of delinquency.

f. Servicers such as Rocket Mortgage were required to contact borrowers early in the delinquency cycle.

g. By the 45th day of delinquency, servicers must assign personnel to assist the borrower and be available to discuss options.

h. Servicers must inform borrowers about loss mitigation options during live contact

29.     Rocket Mortgage was  required to offer and communicate with the

Plaintiff regarding the loss mitigation options indicated in the Regulations,

which were the following:

a. Deeds in lieu of foreclosure

b. preforeclosure sales

c. assumptions

d. special forbearance

e. recasting of mortgages

f.  partial claims

30.     These efforts to contact the borrower via phone must continue at

least twice per week until contact is established or the servicer determines

the property is vacant or abandoned.

31. These contact attempts should be made at varying times and days of the

week, and must be documented in the Rocket Mortgage servicing file.

32.     These contact attempts have been documented by Rocket

Mortgage in its servicing file.

33.    These requirements are located in the Code of Federal Regulations, which

provide:

 203.605 Loss mitigation performance.

(a)Duty to mitigate. Before four full monthly installments due on the mortgage have become unpaid, the mortgagee shall evaluate on a monthly basis all of the loss mitigation techniques provided at § 203.501 to

determine which is appropriate. Based upon such evaluations, the mortgagee shall take the appropriate loss mitigation action. Documentation must be maintained for the initial and all subsequent evaluations and resulting loss mitigation actions. Should a claim for mortgage insurance benefits later be filed, the mortgagee shall maintain this documentation in the claim review file under the requirements of § 203.365(c).

(b)Assessment of mortgagee's loss mitigation performance.

(1) HUD will measure and advise mortgagees of their loss mitigation performance through the Tier Ranking System (TRS). Under the TRS, HUD will analyze each mortgagee's loss mitigation efforts portfolio-wide on a quarterly basis, based on 12 months of performance, by computing ratios involving loss mitigation attempts, defaults, and claims. Based on the ratios, HUD will group mortgagees in four tiers (Tiers 1, 2, 3, and 4), with Tier 1 representing the highest or best ranking mortgagees and Tier 4 representing the lowest or least satisfactory ranking mortgagees. The precise methodology for calculating the TRS ratios and for determining the tier stratification (or cutoff points) will be provided through FEDERAL REGISTER notice. Notice of future TRS methodology or stratification changes will be published in the FEDERAL REGISTER and will provide a 30-day public comment period.

(2) Before HUD issues each quarterly TRS notice, HUD will review the number of claims paid to the mortgagee. If HUD determines that the lender's low TRS score is the result of a small number of defaults or a small number of foreclosure claims, or both, as defined by notice, HUD may determine not to designate the mortgagee as Tier 3 or Tier 4, and the mortgagee will remain unranked.

(3) Within 30 calendar days after the date of the TRS notice, a mortgagee that scored in Tier 4 may appeal its ranking to the Deputy Assistant Secretary for Single Family or the Deputy Assistant Secretary's designee and request an informal HUD conference. The only basis for appeal by the Tier 4 mortgagee is disagreement with the data used by HUD to calculate the mortgagee's ranking. If HUD determines that the mortgagee's Tier 4 ranking was based on incorrect or incomplete data, the mortgagee's

performance will be recalculated, and the mortgagee will receive a corrected tier ranking score.

(c)Assessment of civil money penalty. A mortgagee that is found to have failed to engage in loss mitigation as required under paragraph (a) of this section shall be liable for a civil money penalty as provided in § 30.35(c) of this title.

34.    The HUD loss mitigation regulations are contained at this section, §

203.501 Loss mitigation, which provides:

Mortgagees must consider the comparative effects of their elective servicing actions, and must take those appropriate actions which can reasonably be expected to generate the smallest financial loss to the Department. Such actions include, but are not limited to, deeds in lieu of foreclosure under § 203.357, pre-foreclosure sales under § 203.370, partial claims under § 203.414, assumptions under § 203.512, special forbearance under §§ 203.471 and 203.614, and recasting of mortgages under § 203.616. HUD may prescribe conditions and requirements for the appropriate use of these loss mitigation actions, concerning such matters as owner-occupancy, extent of previous defaults, prior use of loss mitigation, and evaluation of the mortgagor's income, credit and property.

35.    During Covid, the HUD regulations required the loan servicer to solicit mortgagees who were past due all loss mitigation options without the necessity of any application or documents to be submitted. These regulations remain in effect.

36.    12 C.F.R. 1024.39 is a mortgage servicing regulation promulgated by the Consumer Financial Protection Bureau ("CFPB")

37.    This regulation states:

**Live contact.** Except as otherwise provided in this section, a servicer shall establish or make good faith efforts to establish live contact with a delinquent borrower no later than the 36th day of a borrower's delinquency and again no later than 36 days after each payment due date so long as the borrower remains delinquent. Promptly after establishing live contact with a borrower, the servicer shall inform the borrower about the availability of loss mitigation options, if appropriate, and take the actions described in paragraph 39(e) of this section, if applicable.

38.    The CFPB commentary for this Regulation provides:

1. Delinquency. Section 1024.39 requires a servicer to establish or attempt to establish live contact no later than the 36th day of a borrower's delinquency. This provision is illustrated as follows:

i. Assume a mortgage loan obligation with a monthly billing cycle and monthly payments of $2,000 representing principal, interest, and escrow due on the first of each month.

A. The borrower fails to make a payment of $2,000 on, and makes no payment during the 36-day period after, January 1. The servicer must establish or make good faith efforts to establish live contact not later than 36 days after January 1 - **i.e.,** on or before February 6.

B. The borrower makes no payments during the period January 1 through April 1, although payments of $2,000 each on January 1, February 1, and March 1 are due. Assuming it is not a leap year, the borrower is 90 days delinquent as of April 1. The servicer may time its attempts to establish live contact such that a single attempt will meet the requirements of § 1024.39(a) for two missed payments. To illustrate, the servicer complies with § 1024.39(a) if the servicer makes a good faith effort to establish live contact with the borrower, for example, on February 5 and again on March 25. The February 5 attempt meets the requirements of § 1024.39(a) for both the January 1 and February 1 missed payments. The March 25 attempt meets the requirements of § 1024.39(a) for the March 1 missed payment.

ii. A borrower who is performing as agreed under a loss mitigation option designed to bring the borrower current on a previously missed payment is not delinquent for purposes of § 1024.39.

iii. During the 60-day period beginning on the effective date of transfer of the servicing of any mortgage loan, a borrower is not delinquent for purposes of § 1024.39 if the transferee servicer learns that the borrower has made a timely payment that has been misdirected to the transferor servicer and the transferee servicer documents its files accordingly. **See** § 1024.33(c)(1) and comment 33(c)(1)-2.

iv. A servicer need not establish live contact with a borrower unless the borrower is delinquent during the 36 days after a payment due date. If the borrower satisfies a payment in full before the end of the 36-day period, the servicer need not establish live contact with the borrower. For example, if a borrower misses a January 1 due date but makes that payment on February 1, a servicer need not establish or make good faith efforts to establish live contact by February 6.

2**. Establishing live contact.** Live contact provides servicers an opportunity to discuss the circumstances of a borrower's delinquency. Live contact with a borrower includes speaking on the telephone or conducting an in-person meeting with the borrower but not leaving a recorded phone message. A servicer may rely on live contact established at the borrower's initiative to satisfy the live contact requirement in § 1024.39(a). Servicers may also combine contacts made pursuant to § 1024.39(a) with contacts made with borrowers for other reasons, for instance, by telling borrowers on collection calls that loss mitigation options may be available.

3. **Good faith efforts.** Good faith efforts to establish live contact consist of reasonable steps, under the circumstances, to reach a borrower and may include telephoning the borrower on more than one occasion or sending written or electronic communication encouraging the borrower to establish

live contact with the servicer. The length of a borrower's delinquency, as well as a borrower's failure to respond to a servicer's repeated attempts at communication pursuant to § 1024.39(a), are relevant circumstances to consider. For example, whereas "good faith efforts" to establish live contact with regard to a borrower with two consecutive missed payments might require a telephone call, "good faith efforts" to establish live contact with regard to an unresponsive borrower with six or more consecutive missed payments might require no more than including a sentence requesting that the borrower contact the servicer with regard to the delinquencies in the periodic statement or in an electronic communication. However, if a borrower is in a situation such that the additional live contact information is required under § 1024.39(e) or if a servicer relies on the temporary special COVID-19 loss mitigation procedural safeguards provision in § 1024.41(f)(3)(ii)(C)(1), providing no more than a sentence requesting that the borrower contact the servicer with regard to the delinquencies in the periodic statement or in an electronic communication would not be a reasonable step, under the circumstances, to make good faith efforts to establish live contact. Comment 39(a)-6 discusses the relationship between live contact and the loss mitigation procedures set forth in § 1024.41.

4. **Promptly inform if appropriate.**

i. **Servicer's determination.** Except as provided in § 1024.39(e), it is within a servicer's reasonable discretion to determine whether informing a borrower about the availability of loss mitigation options is appropriate under the circumstances. The following examples demonstrate when a servicer has made a reasonable determination regarding the appropriateness of providing information about loss mitigation options.

A. A servicer provides information about the availability of loss mitigation options to a borrower who notifies a servicer during live contact of a material adverse change in the borrower's financial circumstances that is likely to cause the borrower to experience a long-term delinquency for which loss mitigation options may be available.

B. A servicer does not provide information about the availability of loss mitigation options to a borrower who has missed a January 1 payment and notified the servicer that full late payment will be transmitted to the servicer by February 15.

ii. **Promptly inform.** If appropriate, a servicer may inform borrowers about the availability of loss mitigation options orally, in writing, or through electronic communication, but the servicer must provide such information promptly after the servicer establishes live contact. Except as provided in

§ 1024.39(e), a servicer need not notify a borrower about any particular loss mitigation options at this time; if appropriate, a servicer need only inform borrowers generally that loss mitigation options may be available. If appropriate, a servicer may satisfy the requirement in § 1024.39(a) to inform a borrower about loss mitigation options by providing the written notice required by § 1024.39(b)(1), but the servicer must provide such notice promptly after the servicer establishes live contact.

39.     On February 21, 2024 HUD issued Mortgagee Letter 2024-02.

40.     This Mortgagee Letter established a new loss mitigation program for FHA insured loans.

41.     This Mortgagee Letter (ML) established the Payment Supplement loss mitigation option.

42.     This Mortgagee Letter provided the following loss mitigation option:

To that end, this ML establishes a new loss mitigation option, the Payment Supplement, which will combine a standalone Partial Claim to bring the Mortgage current with a new Monthly Principal Reduction (MoPR) payment. This will temporarily reduce the Borrower's monthly Mortgage Payment for a period of three years, without requiring the Mortgage to be modified. After the Payment Supplement Period ends, the Borrower will be responsible for resuming payment of the full monthly Principal and Interest (P&I) amount. HUD intends to make the Payment Supplement a permanent part of FHA's loss mitigation options and will incorporate language to do so in a future ML or as an update to Handbook 4000.1.

43.     HUD Mortgagee Letter 2013-32 established that a partial claim loss mitigation option would be the total amount available which is the lesser of: 1) 30% of the outstanding unpaid principal balance less any previous Partial Claims paid on this mortgage; and 2) the sum of:

1. Arrearages;

2. Legal fees and foreclosure costs related to a canceled foreclosure action; and

3. Principal deferment (per below calculation).

44.     The Plaintiff in 2023 was  provided a prior PHA partial claim in the amount of $54,743.90.

45.     The principal balance of the Plaintiff's mortgage loan at the time of default was $255,021.72.

46.     The maximum partial claim at the time of default was $76,506.52 less the prior partial claim of $54,743,90 which equaled $21,762.62.

47.    Before any alleged acceleration and foreclosure sale of any FHA mortgage loan was declared,  Rocket Mortgage was required to strictly comply with the terms of the mortgage and was required to comply with all FHA/HUD guidelines including loss mitigation.

48.     Defendant Rocket Mortgage, LLC did not strictly comply with the terms of the mortgage to attempt to exercise the statutory power of sale as indicated above.

49.     Plaintiff was not provided the opportunity to have a face-to-face meeting with Rocket Mortgage, LLC prior to any acceleration and sale and no face to face meeting was scheduled for Plaintiff by Rocket Mortgage, LLC. or any loan servicer or any owner of this mortgage note.

50.     Neither Rocket Mortgage nor any entity acting on its behalf, made a visit to the home of the Plaintiff to solicit him for a  face-to-face meeting to schedule a loss mitigation meeting with a representative of Rocket or any other entity acting on its behalf.

51.     Neither Rocket Mortgage nor any entity acting on its behalf ever called the Plaintiff once he went into default and twice per week to discuss loss mitigation options and explain the Plaintiff those loss mitigation options as required by the HUD Regulations.

52.     No phone calls were made by Rocket Mortgage to the Plaintiff as required by the HUD Regulations to provide the Plaintiff all available loss mitigation options.

53.     Plaintiff was eligible for a standalone partial claim loss mitigation option, when he went into default and was also eligible for a loan modification combined with a partial claim loss mitigation option along with a Payment Supplement loss mitigation option, when he went into default.

54.     These options were never provided to the Plaintiff nor explained to him by a phone call as required by the HUD Regulations.

55.     Neither Rocket Mortgage nor any entity acting on its behalf ever called the Plaintiff  thirty six days after he went into default and every thirty six days later

to discuss loss mitigation options and explain the Plaintiff those loss mitigation options as required by the 12 C.R.R. 1024.39.

56.     As a result of this failure to comply with  the HUD Regulations and 12 C.F.R. 1024.39 Rocket Mortgage could not exercise the statutory power of sale.

57.     Strict compliance with the  HUD Regulations and 12 C.F.R. 1024.39 was required for the owner of the mortgage to exercise the statutory power of sale.

58.     Rocket Mortgage purported to mail a  Notice of Foreclosure Sale ,
which did not strictly comply with the terms of the mortgage and R.I.G.L.
34-27-4.

59.     A copy of this Notice of Sale is attached as Exhibit C.

60.     This notice was not signed.

61.     This notice was printed by MailPro Solutions, 2001 NW 64th
Street Suite 110. Fort Lauderdale, FL, 33309.

62The law firm of Brock and  Scott, PLLC did not mail this Notice of Sale
on behalf of Ginnie Mae II or Rocket Mortgage.

63.     The law firm of Brock and  Scott, PPLC never mailed this letter.

64.     Mailpro Solutions is not a law firm.

65.     Mailpro Solutions was never authorized by Ginnie Mae II or
Rocket Mortgage to mail any letters scheduling a foreclosure sale of
Plaintiff's home.

66.     This purported Notice of Sale was not mailed by certified mail
return receipt requested.

67.     Instead, this purported Notice of Sale was not mailed by certified mail electronic receipt to save money on the mailing, as indicated by USPS tracking receipt number 941481903613196132900, attached as Exhibit D.

68.     Pursuant to R.I.G.L. 34-27-11 and 34-27-4, any foreclosure sale which is not mailed by certified mail return receipt requested is void.

69. This purported Notice of Sale falsely stated that Brock and Scott PLLC had an address of 2001 NW 64th Street, Suite 110, Fort Lauderdale, FL 33309 in an attempt to collect a debt, even though this address is the address of Mailpro.

70.     The Plaintiff is not filing an action against Brock and Scott, PLLC for its violation of the Fair Dept Collection Practices Act.

71.     This purported Notice of Sale scheduled a foreclosure sale on January 24, 2025.

72.     At this purported sale,  the original bidder defaulted, and the second bidder was Seven Deuce, LLC a Rhode Island limited liability company, which has bid $300,000.00 for this sale.

73.     This property has a minimum fair market value of $420,000.00.

74.     No foreclosure deed has yet been recorded.

75.     This sale is also void because the purported unsigned Notice of Default dated August 22, 2024, attached as Exhibit D  did not strictly comply with the terms of the mortgage.

76.     This unsigned letter was also not mailed by Rocket Mortgage.

77.     This unsigned letter was not printed by Rocket Mortgage.

78.     This unsigned letter was printed and mailed by Covius Print Ready Services in Temecula, California, a purported mail vendor for Rocket Mortgage.

79.     Covius Print Ready Services is not licensed to practice law in Rhode Island.

80.     This letter did not strictly comply with the terms of the note and mortgage by demanding that the Plaintiff pay late charges of $300.18.

81.     The monthly late fee for this mortgage loan was $50.03.

82.     The actual total late fee due on the mortgage loan account was $300.12.

83.     This letter also did not strictly comply with the terms of the mortgage and note by demanding other unspecified charges of $25.00 and an unspecified corporate advance balance of $177.78.

84.    Such additional charges, other than the monthly payment due, are only permitted to be demanded in order to reinstate the mortgage after acceleration.

85.    This letter also falsely stated that failure to cure would result in a foreclosure proceeding in which Rocket Mortgage on behalf of Ginnie Mae II would pursue a deficiency judgment.

86.    This letter also did not strictly comply with the terms of the mortgage by stating that failure to cure the mortgage on or before a date specified as October 11, 2024 may result in acceleration and sale.

87.    This portion of the letter demanded payment at a date before thirty days had passed from the date that the letter was deposited in the mail by the mail vendor and did not strictly comply with the mortgage.

88.    This mortgage and note were never accelerated by Rocket Mortgage or Ginnie Mae II.

89.    Paragraph 19 of the mortgage requires that the fees and expenses demanded in the default letter only be required to be paid after the mortgage and note were accelerated.

90.    Exhibit  F  is a copy of the periodic statements mailed by Rocket Mortgage to Plaintiff from April 2024 through December, 2024.

91.     These statements indicated that the mortgage was not accelerated prior to the mailing of the purported Notice of Sale.

92.     This purported sale was also defective because Rocket Mortgage, the loan servicer did not comply with 12 CFR 1024.41(1), which states

(1) Pre-foreclosure review period. A servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:

(i) A borrower's mortgage loan obligation is more than 120 days delinquent.

93.     The first Notice required by Rhode Island law for a foreclosure was the Notice of Default, attached to this Amended Complaint, which was mailed to the Plaintiff dated August 22, 2024, when the Plaintiff was due for the May 1, 2024 payment and was  not 120 days delinquent when this Notice of Default was mailed.

94.     Due to this failure to comply with the terms of the mortgage, and the HUD Regulations and the RESPA regulations, no entity was contractually authorized to exercise the statutory power of sale and foreclose on the Plaintiff's mortgage.

95.     As a result of the improper and invalid attempt to exercise the statutory power of sale due to the failure to comply with the HUD regulations, Plaintiff's  mortgage loan account was charged fees and costs and expenses for certified mail, advertising costs, legal fees, auctioneer costs and other improper charges, diminishing the equity of the Plaintiff in this property.

96.     Plaintiff has incurred legal fees for the prosecution of this action as a result of the breach of contract by Rocket Mortgage, LLC, whose actions were a breach of the covenant of good faith and dealing and were willful, wanton and reckless, warranting the imposition of punitive damages.

97.  Plaintiff will be irreparably harmed by  Defendant's improper exercise of the statutory power of sale without complying with the HUD regulations , the terms of the mortgage and the provisions of 12 C.F.R. 1024.39 and Seven Deuce, LLC  is allowed to obtain title to Plaintiff's home.

98.  Rocket Mortgage, LLC seeks to convey a foreclosure deed to Seven Deuce, LLC for $300,000.00.

99.  This bid is $120,000.00 less than the value of the property.

100.     The amount of the bid will not pay for the total obligation

due to Ginnie Mae II when including the total amount of this mortgage and the prior partial claim.

101.        The HUD loss mitigation options if provided to the Plaintiff will make this mortgage loan current.

102.    Plaintiff has a substantial likelihood of success in the pending action, would otherwise suffer irreparable harm and can claim the greater hardship in the absence of an order, which will not deserve the public interest if imposed.

103.    The failure of the Defendant to strictly comply with the HUD Regulations,   renders void the alleged foreclosure by Statutory Power of Sale, without Rocket Mortgage or Ginnie Mae II being able to do so.

104.    These facts demonstrate that Plaintiff has a substantial likelihood of success.

105.    Rocket Mortgage, LLC's attempted  foreclosure of Plaintiff's property by a party not entitled to foreclose on the property will cause Plaintiff irreparable

harm, which hardship is greater than any hardship, which may be claimed

by defendant.

106.    Such relief sought by Plaintiff will not disserve the public interest if imposed.

107.    This property is Plaintiff's  home where he lives  with his wife and two children and Plaintiff would be irreparably harmed if a sale is allowed to be completed and a deed recorded.

118.    Since there has been no compliance with the HUD regulations requiring a Face-to-Face meeting and an explanation of all loss mitigation options as a prerequisite to the declaration of default, and due to the failure to mail a default letter in strict compliance with the terms of the mortgage and failure to comply with R.I.G.L. 34-11-2 and 34-27-2, any alleged foreclosure sale is void.

109.    Plaintiff has incurred legal fees and expenses due to the conduct of the Defendant in not complying with the provisions of the HUD regulations and the terms of the mortgage.

Wherefore Plaintiff demands that this Court:

a. Issue a Declaratory Judgment that the purported foreclosure sale

was void for failure to strictly comply with the terms of the mortgage and

the HUD regulations

b.  Award the Plaintiff actual damages and compensatory damages

and legal fees and costs against Rocket Mortgage for breach of the terms of

the mortgage and the HUD Regulations.

c. Grant all other just and proper relief.


July 24,  2025                                AMERRISQUE TABLADA

        By his Attorney
        /s/ John B. Ennis
                                             JOHN B. ENNIS, ESQ. #2135
        1200 Reservoir Avenue
                                             Cranston, RI 02920
                                             (401) 943-9230
                                             Jbelaw75@gmail.com


COUNT II

COMPLAINT FOR INJUNCTIVE RELIEF

110.     Plaintiff restates and incorporates all of the allegations contained

in paragraphs 1 through 109 in their entirety, as if fully rewritten herein.

111.     Plaintiff will be irreparably harmed if this sale proceeds and Seven

Deuce, LLC pays $300,000.00 for a reduced price for this property worth

more than $500,000.00.

112.     This property is Plaintiff's home where he lives with his wife and two children.

113.     Plaintiff is requesting that this Court Preliminarily and Permanently

Restrain and Enjoin Rocket Mortgage, LLC or any entity acting on their behalf from preparing or transferring  a foreclosure deed to Seven Deuce, LLC  or any other entity  or taking any further action in regard to this foreclosure.

WHEREFORE, Plaintiff demands that this Court:

a. Grant a Preliminary Injunction Restraining and Enjoining Rocket Mortgage, Ginnie Mae II and Seven Deuce, LLC and any other entity acting on its behalf from executing a Foreclosure Deed from Rocket Mortgage, LLC to Seven Deuce, LLC or any other entity or from accepting $300,000.00 from B Seven Deuce, LLC or mailing a new Notice of Sale or any other entity pending a hearing on a Permanent Injunction.

b. Grant a Permanent Injunction Restraining and Enjoining Rocket Mortgage and Ginnie Mae II and Seven Deuce, LLC and any other entity acting on its behalf from completing the purported sale, executing and recording a Foreclosure Deed from Rocket Mortgage, LLC to Seven

Deuce, LLC or any other entity or from accepting $300,000.00 from Seven

Deuce, LLC or mailing a new Notice of Sale.

c. Award the Plaintiff actual damages and compensatory damages

and legal fees and costs against the Rocket Mortgage and Ginnie Mae II for

breach of the terms of the mortgage and the HUD Regulations.

d. Grant all other just and proper relief.

July 24, 2025                                    AMERRISQUE TABLADA

     By his Attorney
     /s/ John B. Ennis

                     JOHN B. ENNIS, ESQ. #2135

     1200 Reservoir Avenue

                     Cranston, RI 02920
                     (401) 943-9230
                     Jbelaw75@gmail.com


     COUNT III

COMPLAINT AGAINST ROCKET MORTGAGE UNDER THE REAL
ESTATE SETTLEMENT AND PROCEDURES ACT FOR NOT
CORRECTING THE ERROR OF NOT COMPLYING WITH HUD
REGULATIONS CONDUCTING A FORECLOSURE SALE AND FOR
NOT RESCINDING THE SALE

114.     Plaintiff restates and incorporates all of the allegations contained

in paragraphs 1 through 113 in their entirety, as if fully rewritten herein.

115.     This action is filed to enforce statutory provisions of RESPA as

well as regulations promulgated by the Consumer Financial Protection

Bureau (CFPB) and that became effective on January 10, 2014, specifically, 12 C.F.R. § 1024.1, *et seq.* ("Regulation X").

116.    In January 2013, the CFPB issued a number of final rules concerning mortgage markets in the United States, pursuant to the DFA, Public Law No. 111-203, 124 Stat. 1376 (2010).

117.    Specifically, on January 17, 2013, the CFPB issued the Real Estate Settlement Procedures Act Mortgage Servicing Final Rules, 78 Fed. Reg. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

118.    Plaintiff asserts claims for relief against Rocket Mortgage  for violations of the specific rules under RESPA and Regulation X, as set forth, *infra.*

119    Rocket Mortgage is a mortgage servicer as defined by RESPA and Regulation X. 12 U.S.C. § 2605(i)(2); 12 C.F.R. § 1024.2(b).

120.    The Loan is a "federally related mortgage loan" as defined by RESPA and

Regulation X. 12 U.S.C. § 2602(1); 12 C.F.R. § 1024.2(b).

121.    The Loan is not a "reverse mortgage transaction" as defined by RESPA and

Regulation X. 12 C.F.R. § 1024.31; *see* 12 C.F.R. § 1026.33(a) (Regulation Z).

122     The Loan is secured by the home which is Plaintiff's principal residence. 12 C.F.R. § 1024.30(c)(2).

123.    Rocket Mortage is subject to the requirements of RESPA and Regulation X and does not qualify for the exception for "small servicers"— as defined by 12 C.F.R. § 1026.41(e)(4)—nor for the exemption for a "qualified lender"—as defined by 12 C.F.R. § 617.7000.

124.    Mortgage servicers are prohibited from failing "to take timely action to respond to a borrower request to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

125.    Mortgage servicers are prohibited from failing "to comply with any other obligation  found by the CFPB, by regulation, to be appropriate to carry out the consumer protection purposes of [RESPA]." 12 U.S.C. § 2605(k)(1)(E).

126.    Plaintiff has a private right action under RESPA and Regulation X pursuant to 12 U.S.C. § 2605(f) for the claimed violations and such action provides for remedies including actual damages, statutory damages, and attorneys' fees and costs.

127.    A servicer of a federally related mortgage shall not "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

128.    On or about January 31, 2025, the Plaintiff , mailed a written notice of error to the Defendant at its designated mailing address of Rocket Mortgage, LLC, P.O. Box 442359, Detroit, MI 48244,  that included the name of the borrower, the identity of the account, the property description and stated the information requested.

198.    This Notice of Error was sent pursuant to 12 CFR § 1024.35, a copy of which is attached as Exhibit 1.

129.    The Notice of Error was mailed by certified mail, electronic receipt requested, having an article number 9405511898765458788895.

130.    The Notice of Error was mailed to the address noticed by the

Defendant on its website as the designated address for requesting such

information as provided for by 12 CFR § 1024.35.

131.   The Notice of Error was received by the Defendant on February 7,

2025 as indicated by the USPS tracking receipt attached as Exhibit 2.

132.    This Notice of Error alleged errors by Rocket Mortgage set forth

in 12 C.F.R. 1024.35 (7), (9),  (10) and (11):

(7) Failure to provide accurate information to a borrower regarding loss
mitigation options and foreclosure, as required by § 1024.39.

(9) Making the first notice or filing required by applicable law for any
judicial or non-judicial foreclosure process in violation of § 1024.41(f) or
(j).

(10) Moving for foreclosure judgment or order of sale, or conducting a
foreclosure sale in violation of § 1024.41(g) or (j).

(11) Any other error relating to the servicing of a borrower's mortgage loan.

133.   The Plaintiff's Notice of Error referenced the failure by Rocket

Mortgage to have provided Plaintiff all loss mitigation options and its

failure to  rescind the purported foreclosure sale.

134.   Under 12 CFR 1024.35 the Notice of Error had to be responded to by

the Defendant within thirty (30) business days of the date of the receipt of

the Request.  The Regulations provide that in computing this time period

public holidays, Saturdays and Sundays are excluded.

135.  Rocket Mortgage did not correct the error.

136.     Rocket Mortgage did not comply with its obligations pursuant to

12 C.F.R. 1024.35, which sets forth a servicer's obligations  when it denies

that an error occurred.

137.     Rocket Mortgage did not conduct a reasonable investigation

regarding this error.

138.     Rocket Mortgage did not provide the Plaintiff with a  statement

that Rocket Mortgage  has determined that no error occurred, a statement

of the reason or reasons for this determination, a statement of the

borrower's right to request documents relied upon by the servicer in

reaching its determination, information regarding how the borrower can

request such documents, and contact information, including a telephone

number, for further assistance.

136.     Rocket Mortgage did not  reasonably evaluate the errors asserted

in the Notice of Error and did not provide a reasonable  response to this

Notice of Error, instead it ignored the errors asserted in its letter dated

February 26,2025 (Exhibit 3).

137. Rocket Mortgage, in this case, has exhibited a pattern and practice of failing to comply with the Regulations as it failed to comply with multiple notices of error.

138. As a result of this lack of compliance, Nationstar is liable to Plaintiff for actual damages, statutory damages, costs and attorney's fees for its failure to correct the error.

139. The Plaintiff has incurred actual damages, costs and legal fees as a result of Rocket Mortgage disregarding the Notice of Error and in not correcting the errors asserted in this Notice of Error.

140. Rocket Mortgage's failure to correct the error asserted caused actual damages caused , which include the loss of equity in his home and the necessity of incurring costs to file suit to set aside this sale.

141. He has incurred costs for gasoline to visit his attorney on at least two occasions, driving to his attorney's office for a round trip totaling 57.2 miles to speak with his attorney regarding the foreclosure and Rocket Mortgage's refusal to correct this error.

142. The IRS standard mileage allowance provides for .56 per mile.

143.     He has incurred  the expense of using electricity to recharge his cell phone to call and receive calls from his attorney regarding this Notice of Error.

144.  He has incurred postage and copying costs in transmitting this Notice of Error to Rocket Mortgage, which has been disregarded by Rocket Mortgage.

145. He has spent time away from his normal activities and  has taken time away from his wife and children to visit his attorney  to discuss Rocket Mortgage's failure to correct this error  by rescinding this foreclosure and removing the legal fees and costs from the mortgage loan account attributable to the purported foreclosure.

146.     He has spent time away from his normal activities and has taken time away from his wife and family to call and visit his attorney, regarding this Notice of Error.

147.   He has incurred attorney fees and costs in order to correct the error and for the prosecution of this action.

148.     He has incurred emotional distress worrying about the foreclosure and possibly being forced to leave his home.

149.    Legal fees and costs have been charged to his mortgage loan account due to the failure to correct this error, which has diminished his equity in the property.

150.    His fee agreement with his attorney provides that he will be responsible for legal fees and expenses incurred in regard to this action.

151.  The Plaintiff has demonstrated through the failure of Rocket Mortgage to respond to multiple Notices of Error that Rocket Mortgage has exhibited a pattern and practice of failure to respond to RESPA Notices of Error.

 WHEREFORE, Plaintiff demands judgment against Rocket Mortgage for actual damages as alleged and relief including but not limited to providing him a Partial Claim and a FHA Payment Supplement Modification, rescinding the foreclosure sale and removing all legal fees and costs arising from this foreclosure sale plus statutory damages of $2,000.00 for this violation of Regulation X,  plus attorney fees and costs.

July 24, 2025                              AMERRISQUE TABLADA

                                          By his Attorney
                                          /s/ John B. Ennis
                                          JOHN B. ENNIS, ESQ. #2135
                                          1200 Reservoir Avenue
                                          Cranston, RI 02920

(401) 943-9230
Jbelaw75@gmail.com

## COUNT IV

COMPLAINT AGAINST ROCKET MORTGAGE FOR VIOLATION OF RESPA FOR NOT CORRECTING AN ERROR DUE TO FAILURE TO PROVIDE ALL DOCUMENTS ON WHICH ROCKET MORTGAGE CLAIMED THAT NO ERROR HAD OCCURRED

152.    Plaintiff restates and incorporates all of the allegations contained in paragraphs 1 through 151 in their entirety, as if fully rewritten herein.

153.    On March 5, 2025, Plaintiff mailed a Notice of Error to Rocket Mortgage at its designated address.        A copy of this Notice of Error is attached as Exhibit 4.

154.    Rocket Mortgage received this Notice of Error on March 17, 2025, as indicated by USPS tracking receipt number 9481711898765451365400, attached as Exhibit 5

155.    This Notice of Error asserted the error that Rocket Mortgage had not responded to a Request for Information to provide within fifteen days of receipt all documents on which it based its assertion that had not committed any error by not providing the Plaintiff all loss mitigation options and by not rescinding the foreclosure sale.

156.     This Notice of Error contained the Request for Information mailed
to Rocket Mortgage dated February 19, 2025 and received on February 27,
2015 as indicated by USPS tracking receipt number
9481711898765456846607, attached as Exhibit 6.

157.     Rocket Mortgage refused to respond to the Request for
Information within fifteen days or at any time.

158.     Instead of responding to this RESPA request, it stated that the
Request for Information was duplicative and that it had already responded
on February 27, 2025.

159.     Rocket Mortgage did not comply with its obligations under
RESPA and could not have already provided documents on February 26,
2025 in response to a Request for Information which it received on
February 27, 2025.

160.     Prior to receipt of this Request for Information, Rocket Mortgage
had not been requested to provide all documents on which it had based its
assertions that no error occurred.

161. Under 12 C.F.R. 1024.35 the Notice of Error had to be responded to
by the Defendant within thirty (30) business days of the date of the receipt

of the Request.  The Regulations provide that in computing this time period,  public holidays, Saturdays and Sundays are excluded.

161.  Rocket Mortgage did not correct the error by providing the information.

162.    Rocket Mortgage did not comply with its obligations pursuant to 12 C.F.R. 1024.35 when it denied that an error occurred.

163.    Rocket Mortgage did not conduct a reasonable investigation regarding this error.

164.    Rocket Mortgage did not provide the Plaintiff with a  statement that Rocket Mortgage  has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

165.    Rocket Mortgage did not  provide a reasonable  response to this Notice of Error.

166.    Rocket Mortgage did not address this Notice of Error in its letter dated April 17, 2025, attached as Exhibit 7.

167.    This letter did not acknowledge receipt of the Notice of Error for failure to provide all documents on which it based its assertion that no error had occurred and only stated that a letter was overbroad and to contact its attorney.

168.    Neither this Notice of Error nor the Request for Information ,which was not complied with, was overbroad as described by the Consumer Financial Protection Bureau in its interpretations of Regulation X.

169.    Rocket Mortgage disregarded this Notice of Error just as it had in regard to the prior Notice of Error mailed by the Plaintiff.

170. Rocket Mortgage has continued to exhibit a pattern and practice of failing to comply with the Regulations as it failed to comply with multiple notices of error.

171.   As a result of this lack of compliance, Rocket Mortgage is liable to Plaintiff for actual damages, statutory damages, costs and attorney's fees for its failure to correct this error.

172.    Plaintiff filed this Notice of Error to obtain documents on which Rocket Mortgage based its assertions that no error had occurred, which documents must be provided pursuant to 12 C.F.R. 1024.35.

173.    The Request for Information was mailed to determine the factual basis for Rocket Mortgage's assertion that it had not committed error by not rescinding the foreclosure sale.

174.    The Request for Information was mailed to determine the factual basis for Rocket Mortgage's assertion that it had not committed error and had purportedly complied with the HUD regulations.

175.   The Plaintiff has incurred actual damages, costs and legal fees caused by the failure of Rocket Mortgage to correct the error alleged in this Notice of Error.

176.    The actual damages include the loss of equity in his home and the necessity of incurring costs to file suit to set aside this sale.

177.   He has incurred costs for gasoline to visit his attorney on at least one occasions, driving to his attorney's office for a round trip totaling 57.2 miles to speak with his attorney regarding the foreclosure and Rocket Mortgage's refusal to correct this error.

178.    The IRS standard mileage allowance provides for .56 per mile.

179.    He has incurred the expense of using electricity to recharge his cell phone to call and receive calls from his attorney regarding this Notice of Error.

180.  He has incurred postage and copying costs in transmitting this Notice of Error to Rocket Mortgage.

181. He has spent time away from his normal activities and has taken time away from his wife and children to visit his attorney  regarding Rocket Mortgage's failure to correct this error  by rescinding this foreclosure.

182.     He has spent time away from her normal activities and has taken time away from his wife and family to call his attorney, regarding this Notice of Error.

183.  He has incurred attorney fees and costs in order to correct the error and for the prosecution of this action.

184.     His fee agreement with his attorney provides that he will be responsible for legal fees and expenses incurred in regard to this action.

185.  The Plaintiff has demonstrated through the failure of the Defendant to respond to multiple Notices of Error that the Defendant has exhibited a pattern and practice of failure to respond to RESPA Notices of Error.

 WHEREFORE, Plaintiff demands judgment for actual damages as alleged, including but not limited to providing him the documents on which Rocket Mortgage based its contention that no error has occurred  plus statutory

damages of $2,000.00 for this violation of Regulation X, plus attorney fees

and costs.

July 24, 2025                          AMERRISQUE TABLADA


                                       By his Attorney
                                       /s/ John B. Ennis
                                       JOHN B. ENNIS, ESQ. #2135
                                       1200 Reservoir Avenue
                                       Cranston, RI 02920
                                       (401) 943-9230
                                       Jbelaw75@gmail.com




COUNT V


COMPLAINT AGAINST ROCKET MORTGAGE FOR VIOLATION OF
RESPA FOR NOT COMPLYING WITH RESPA AND NOT
CORRECTING THE ERROR DUE TO FAILURE TO CORRECT AN
ERROR OF NOT PROVIDING ALL DOCUMENTS WHICH ROCKET
MORTGAGE CLAIMED WERE THE BASIS FOR ITS ASSERTION
THAT NO ERROR HAD OCCURRED

   186.    Plaintiff restates and incorporates all of the allegations contained

in paragraphs 1 through 185 in their entirety, as if fully rewritten herein.

187.     When Rocket Mortgage refused to respond to the Notice of Error received by it on February 27, 2025 and to comply with its obligations pursuant to RESPA, Plaintiff mailed another Notice of Error on May 13, 2025 to Rocket Mortgage at its designated address to provide Rocket Mortgage another opportunity to correct its error in ignoring the prior Notices of Error.

188.     A copy of this Notice of Error is attached as Exhibit 8.

189.     Rocket Mortgage received this Notice of Error on May 23, 2025 as indicated by USPS tracking receipt number 9405511898765447036334 attached as Exhibit 10.

190.     Rocket Mortgage did not respond to this Notice of Error.

191.     Instead on June 9, 2025 Rocket Mortgage mailed a letter attached as Exhibit 11, which did not constitute a reasonable response pursuant to 12 C.F.R. 1024.35.

192.  Rocket Mortgage did not correct the error by correcting the error and providing the information required pursuant to 12 C.F.R. 1024.35.

193.     Rocket Mortgage falsely stated that it had provided documentation and  that no error had occurred, when in fact the documents requested had never been provided.

194.    Rocket Mortgage did not comply with its obligations pursuant to 12 C.F.R. 1024.35 and did not conduct a reasonable investigation regarding this error.

195.    Rocket Mortgage did not provide the Plaintiff with a statement that Rocket Mortgage has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

196.    Rocket Mortgage did not provide a reasonable response to this Notice of Error.

197.    Rocket Mortgage did not address this Notice of Error in its letter dated June 9, 2025.

198.    This letter did not acknowledge receipt of the Notice of Error for failure to provide all documents on which it based its assertion that no error had occurred and only stated that a letter was overbroad and to contact its attorney.

199.    Neither this Notice of Error nor the Request for Information sought information which was overbroad, confidential, proprietary or privileged.

200.    Rocket Mortgage ignored this Notice of Error and merely stated that the Plaintiff should contact its attorney.

2021    Rocket Mortgage disregarded this Notice of Error just as it had in regard to the prior Notice of Error mailed by the Plaintiff.

202. Rocket Mortgage has exhibited a pattern and practice of failing to comply with the Regulations as it failed to comply with multiple  notices of error.

203.   As a result of this lack of compliance with RESPA, Rocket Mortgage is liable to Plaintiff for actual damages, statutory damages, costs and attorney's fees for its failure to correct the error.

204.   The Plaintiff has incurred actual damages, costs and legal fees caused by the failure of Rocket Mortgage to correct the error alleged in this Notice of Error.

 205.    The actual damages include the loss of equity in his home and the necessity of incurring costs to file suit to set aside this sale.

206.   He has incurred costs for gasoline to visit his attorney on at least one occasions, driving to his  attorney's office for a round trip totaling 57.2 miles  to speak  with his  attorney regarding the foreclosure and Rocket Mortgage's  refusal to correct this error.

207.     The IRS standard mileage allowance provides for .56 per mile.

208.     He has incurred  the expense of using electricity to recharge his cell phone to call and receive calls from his attorney regarding this Notice of Error.

209.  He has incurred postage and copying costs in transmitting this Notice of Error to Rocket Mortgage.

210. He has spent time away from his normal activities and has taken time away from his wife and children to visit his attorney his attorney regarding Rocket Mortgage's failure to correct this error  by rescinding this foreclosure.

211.     He has spent time away from his normal activities and has taken time away from his wife and family to call his attorney, regarding this Notice of Error.

212.   He has incurred attorney fees and costs in order to correct the error and for the prosecution of this action.

213.     His fee agreement with his attorney provides that he will be responsible for legal fees and expenses incurred in regard to this action.

214.   The Plaintiff has demonstrated through the failure of the Defendant to respond to multiple Notices of Error that the Defendant has exhibited a pattern and practice of failure to respond to RESPA Notices of Error.

 WHEREFORE, Plaintiff demands judgment for actual damages as alleged, including but not limited to providing him the documents on which Rocket Mortgage based its contention that no error has occurred  plus statutory damages of $2,000.00 for this violation of Regulation X,  plus attorney fees and costs.

July 24,  2025                                    AMERRISQUE TABLADA

                                                          By his Attorney
                                                          /s/ John B. Ennis
                                                          JOHN B. ENNIS, ESQ. #2135
                                                          1200 Reservoir Avenue
                                                          Cranston, RI 02920
                                                          (401) 943-9230
                                                          Jbelaw75@gmail.com


Plaintiff demands a Trial by Jury

CERTIFICATE OF SERVICE

I certify that a copy of this Amended Complaint was served by electronic filing on July 24, 2025.

/s/ John B. Ennis